IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RICK L. MOLLETT,            )
                           )
Plaintiff,                 )
                           )
vs.                        )    No.  3:11-CV-238
                           )
MICHAEL J. ASTRUE,         )
COMMISSIONER OF SOCIAL     )
SECURITY,                  )
                           )
Defendant.                 )

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff, Rick L. Mollett. For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


BACKGROUND

On August 26, 2008, Plaintiff, Rick L. Mollett ("Mollett" or "claimant"), applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 et seq. and Supplemental Security Insurance ("SSI")

under Title XVI of the Social Security Act, 42 U.S.C. sections 1381 et seq.  Mollett alleged that his disability began on December 15, 2007, while he was employed as a cable installer.  (Tr. 14, 131, 134).  The Social Security Administration denied his initial application and also denied his claims on reconsideration.  (Tr. 63-70, 75-88).  On April 1, 2010, Plaintiff appeared with counsel at an administrative hearing before Administrative Law Judge ("ALJ") John S. Pope ("Pope").  (Tr. 28).  Testimony was provided by the claimant, Luanne Mollett (the claimant's wife), and Melissa Benjamin (a vocational expert).  (*Id*).  On July 22, 2010, ALJ Pope denied the claimant's DIB and SSI claims, finding that Mollet had not been under a disability as defined in the Social Security Act.  (Tr. 11-27).

The claimant requested that the Appeals Council review the ALJ's decision and the request was denied.  (Tr. 1-7, 226-35).  Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a)(2005).  The claimant has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

DISCUSSION

Facts

Mollett was born on September 6, 1968. (Tr. 134).  Mollett alleges the following impairments: nocturnal seizures, type 2

diabetes, hypertension, obesity, depression, borderline intellectual functioning ("BIF"), and cognitive disorder not otherwise specified. Mollett had past relevant work as a cable installer. (Tr. 225).

The medical evidence can be summarized as follows:

In February of 2007, Mollett met with Dr. Thomas M. Banas, a neurologist. (Tr. 261-62). Dr. Banas' impressions were that Mollett suffered from recurrent nocturnal seizures, obesity, mild cognitive impairment, questionable obstructive apnea, and a history of fatigue and depression. (*Id*). Dr. Banas noted that "the nocturnal seizures are typically triggered by sleep deprivation and excessive fatigue and/or component of sleep cycles transitions; but it could be related to frontal lobe discharge, which is typically easily controlled on almost any anticonvulsant given at night, which had been demonstrated by the patient." (*Id*. at 261). Dr. Banas also noted that "[w]ith his current obesity, and progressive symptoms of potential apnea and gingival hyperplasia, I would consider changing to alternative medication if tolerated, noting that he probably will always be at risks [sic] for nocturnal seizures in the right fatigue setting." (*Id*). Dr. Banas put Mollett on Topamax to be increased from 25 milligrams to 100 milligrams over a four week period as he slowly decreased his Dilatin. (Tr. 262). He also recommended aggressive exercise of 45 minutes of walking for five or six days a week, review of food

groups, and continued monitoring for sleep apnea which could provoke nocturnal seizures. (*Id*).

Dr. Banas next saw Mollett in August of 2007. (Tr. 252). He noted that the transition had been successfully made from Dilatin to Topamax. (*Id*). There were no reported seizures. (*Id*). He also noted that the last laboratory showed an elevated Glucose greater than 200 and that Mollett had been taking Metformin. (*Id*). Mollett's physical examination was normal except for some trace edema. (*Id*). The diagnosis included nocturnal seizures, metabolic syndrome and hypertension. (*Id*).

Dr. Banas saw Mollett again in February of 2008, and there had been no reports of seizures since the last visit. (Tr. 246). Dr. Banas observed that Mollett seemed to be somewhat mentally dulled by the Topamax, and he had been unable to perform and keep up at work which resulted in the loss of his job. (*Id*). Mollett's family also noted progressive decline, and his wife was concerned that he had early dementia as it ran in the extended family. (*Id*). On physical exam Mollett appeared somewhat sleepy and dazed. (*Id*). He was slow to respond, and he was searching for words. (*Id*). He had no obvious aphasia, no nystagmus, and no tremors. (*Id*). He had noticeable truncal obesity. (*Id*). Mollett was diagnosed as having progressive memory loss/confusion/sedation, nocturnal seizures (controlled), metabolic syndrome, and hypertension. (*Id*). Dr. Banas noted the decline in Mollett's cognition following the

institution of Topamax which, at this dose Dr. Banas felt would be expected in perhaps fifteen to twenty percent of those taking the drug. (*Id*). Dr. Banas did not believe that there had been any paroxysmal strokes or step-wise changes in his memory. (*Id*). He thought the only other possibility would be an early presentation of dementia which he believed to be less likely. (*Id*). He thought baseline cognitive abilities should be reviewed. (*Id*). Dr. Banas also decided to taper down and take Mollett off the Topamax and put him on Lacictal. (*Id*). He also suggested a PET scan. (*Id*).

Mollet was seen again by Dr. Banas in May of 2008 on a follow-up for his progressive memory loss. (Tr. 242). Dr. Banas noted "that our neuropsychologists have done extensive testing concerning his baseline performance that was borderline and noting after some discrepancy that his decreased effort was a valid effort due to borderline intellectual functioning." (*Id*). He had low average verbal intellectual abilities and verbal memory, but significantly impaired visual spatial perceptions and visual motor abilities. (*Id*). A strong indicator of premorbid low intellectual function was noted, and the doctor noted that it might be exacerbated by Mollett's nocturnal seizures, diabetes, or hypertension. (*Id*). In retrospect, Mollett's wife noted a decline in his ability over a 12-year period of time. (*Id*). The change to Lanictal prevented nocturnal seizures, and there was no significant history of apnea. (*Id*). However, Mollett was not sleeping well and apparently did

-5-

better on Topamax at night.  (*Id*).  The physical exam was normal except for truncal obesity.  (*Id*).  His diagnosis was borderline intellectual abilities questionably declining with premorbid deficits and significant visual spatial deficits, nocturnal seizures, and type 2 diabetes.  (*Id*).  Dr. Banas wanted to arrange additional testing to help characterize potential early dementia.  (*Id*).  If these were negative, he wanted to continue to follow the present medical problems avoiding hypoglycemia and treating his risk factors as much as possible.  (*Id*).  He also switched his Lamictal back to Topamax.  (*Id*).  Apart from a functional evaluation though occupational therapy, Dr. Banas did not know what form of employment Mollett could perform with his visual perceptual limitations and inability to handle rapidly changing environments or new tasks, but he believed a functional evaluation through occupational therapy might be of value.  (*Id*).  Dr. Banas believed that Mollett should seek Social Security disability "due to his low functional abilities that appear to be premorbid and progressively declining at an early age."  (Tr. 243).  He also noted that if there is any evidence of increasing sleep apnea he would recommend a formal sleep study to exclude this and hypoxia as an etiology of his symptoms.  (*Id*).

On October 8, 2008, Mollett met with Dr. Coulter-Kern who performed a psychological evaluation at the request of the Social Security Administration.  (Tr. 307).  Mollett reported that he had

experienced seizures since he was 9 or 10, but that he was not actually diagnosed as having them until age 27. (*Id*). Mollett reported that he typically goes to bed around 10:00 or 11:00 p.m., but he does not fall asleep until 3:00 and 4:00 a.m. (*Id*). Mollett stated that he typically wakes up around 7:30-8:00 a.m. (*Id*). Mollett's mood was "okay" and his affect was consistent with his mood. (Tr. 308). Although he received a high school diploma, he was in learning disabled classes in school. (*Id*). Mollett had worked longest at Comcast Cable Company which was for 5 years; however, he stated that he left in December of 2007 because he was having memory difficulties. (*Id*). Mollett also reported that he rarely cooks, and when he does his wife helps him. (*Id*). When cooking he would typically stay at the stove so he did not forget about the food. (*Id*). Mollett is also able to go to the grocery store if his wife writes a grocery list. (*Id*). He can clean and do laundry, but he must focus and concentrate on one thing until it is done. (*Id*). Mollett reported that his wife takes care of the finances, and he is able to manage his own personal hygiene without assistance. (*Id*). On a typical day Mollett gets up at 8:00 a.m. and once he is dressed he looks after his 2 year old daughter and changes her diaper. (*Id*). He turns on the television and lets her watch Sesame Street or whatever else is on. (*Id*). Mollett is able to make his daughter simple things to eat such as cereal, and there are usually a few dishes that he does. (*Id*).

Then he usually sits and plays with her, trying to keep busy until his wife comes home from work. (*Id*).

Dr. Coulter-Kern noted that although Mollett's motor behavior was normal, he seemed dazed when responding to questions. (Tr. 309). On his mental status examination Mollett was able to recall only one of five words given to him after a five minute delay. (*Id*). He was able to repeat four digits forward and three digits backwards. (*Id*). His ability to perform simple calculations verbally was fair. (*Id*). He had difficulty with serial 7's, and he did serial 3's in 25 seconds with one error which overall showed poor mental control. (*Id*). His ability to understand and interpret abstract information was poor. (*Id*). His ability to understand how two items were conceptually alike or different was fair. (*Id*). His judgment and insight appeared to be good. (*Id*). His fund of information was fair. (Tr. 310).

Mollett was administered the Wechsler Memory Scale-3. (Tr. 310). The results indicated that his overall memory was low and his working memory (ability to hold information in his head while he manipulates it to produce a result) was poor. (Tr. 311). Dr. Coulter-Kern found that his current scores were likely to reflect his true ability. (*Id*). Dr. Coulter-Kern also found that Mollett needed significant structure in order to work in a safe and productive manner, and close supervision would likely be needed. (*Id*). He found that overall Mollett's functioning was low. (*Id*).

Dr. Coulter-Kern diagnosed Mollett with Cognitive Disorder, NOS and assigned Mollett a current Global Assessment of Functioning ("GAF") score of 50. (*Id*). Dr. Coulter-Kern also found that Mollett would likely be able to complete simple repetitive tasks in a work environment, but that he would have difficulty with complex, multi-step procedures given his memory functioning. (Tr. 316).

On October 20, 2008, Mollett met with Dr. Sadaf Sohrab who performed a physical examination at the request of the Social Security Administration. (Tr. 317). Mollett reported that he had a problem with his memory for at least 5 years which he thought was due to his seizure disorder. (*Id*). He reported that his short term memory seemed to be more affected than his long-term memory. (*Id*). Mollett reported having a problem remembering names and faces. (*Id*). Mollett also reported that he had memory testing done which showed that he was suffering from some memory loss, possibly early dementia. (*Id*). Mollett stated that he is unable to do jobs which require him to do a lot of things quickly. (*Id*). The physical examination revealed that Mollett was morbidly obese with slow speech during conversations, but he was able to understand and answer appropriately. (Tr. 318). Dr. Sohrab diagnosed Mollett as having memory loss, nocturnal seizure disorder, and being borderline mentally handicapped. (Tr. 319).

On November 5, 2008, Dr. J. Pressner completed the Psychiatric Review Technique Form. Dr. Pressner noted that Mollett had an

organic mental disorder. (Tr. 323). Dr. Pressner found that Mollett had moderate limitations in daily living activities and mild limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. 333). He found no episodes of decompensation. (*Id*). Dr. Pressner opined that the opinions of Dr. Coulter-Kern pertaining to Mollett's need for significant structure and close supervision were not supported by the test scores or the report of his activities. (Tr. 335). Dr. Pressner noted that when Dr. Coulter-Kern was questioned on the basis for his opinions he reported that Mollett could perform simple repetitive tasks but no complex multi-step procedures. (*Id*). Dr. Pressner gave no weight to Dr. Coulter-Kern's original opinions because he believed they were contrary to the facts. (*Id*). He found that Mollett did not meet any listing. (*Id*).

Dr. Pressner also completed a Mental Residual Functional Capacity Assessment for Mollett. (Tr. 339). He found that Mollett should be able to attend to a task for a two hour period of time, was capable of maintaining a schedule, could understand, remember and carry out simple tasks, could relate on a superficial basis and on an ongoing basis with co-workers and supervisors, could attend to tasks for sufficient periods of time to complete them, and could manage the stresses involved with simple work. (*Id*).

Mollett saw Dr. Banas again in August of 2009 for a follow-up on his seizure disorder and progressive memory loss. (Tr. 379).

Mollett had experienced no seizures on low-dose Topamax, but he appeared to be declining, noting that his wife reported that he can drive around town but not outside of that area. (*Id*). Mollett's wife reported that Mollett had been out of town in Huntington and Fort Wayne, and he could not find his away back to Wabash and had to call for directions. (*Id*). He appeared to have difficulties with names, and at the same time he appeared to be regressing into a depressed state without interest in doing any activity. (*Id*). On his physical exam, Mollett made poor eye contact. (*Id*). He had an almost mechanical quality to his gait. (*Id*). The diagnosis was progressive memory loss, depression, nocturnal seizures, and type 2 diabetes. (*Id*). Dr. Banas found that Mollett had failed to thrive, and that he had borderline intellectual abilities prior to his decline. (*Id*). Dr. Banas also found that Mollett appeared to be disabled from any previous work, and his decondition and depression have added to his symptom complex. (*Id*). Dr. Banas noted that he intended to introduce Wellbutrin XL to see if it was a stimulating antidepressant. (*Id*). He also suggested walking on a daily basis for 30 to 45 minutes a day. (*Id*).

Mollett saw Dr. Banas again in December of 2009 at which time Mollett was very frustrated, noting that he cannot perform work because he was unable to keep up and that the neuropsychologist noted that he has a developmental delay, perhaps a handicap. (Tr. 373). Because of the family's complaint of progressive memory

decline, markers for slowly progressive dementia were reviewed and were negative. (*Id*). Mollett had a PET scan which was normal. (*Id*). Mollett also had a seizure after he fell and hit his head. (*Id*). He had run out of Topamax and Wellbutrin for depression. (*Id*). Mollett admitted to some depression, but it was difficult to characterize. (*Id*). Mollett had poor eye contact during his physical examination, he was very slow, and he appeared to be somewhat sedated. (*Id*). Mollett ambulated slowly across the room without rigidity. (*Id*). Dr. Banas's diagnosis was cognitive impairment; questionably progressive; history of seizure disorder; recent seizure; and diabetes. (*Id*). Dr. Banas found that he was unable to explain the cognitive decline, but he suspected his borderline abilities at baseline are perhaps aggravated by depression and current medications. (*Id*). Dr. Banas concluded by noting that he suspected that Mollett was a candidate for disability for many reasons. (*Id*. at 374).


Review of Commissioner's Decision

  This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings.  *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1).  To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:   Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3:   Does the claimant have an impairment or combination of

-13-

impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to step 4.

Step 4:   Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5:   Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); see also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Mollett suffered from severe mental impairments that significantly affected his ability to work. The ALJ further found that Mollett did not meet or medically equal one of the listed impairments, and could not perform any of his past relevant work, but nonetheless retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations: simple repetitive work tasks, avoidance of even moderate exposure to work hazards; and avoidance of concentrated exposure to pulmonary irritants. (Tr. 18). After considering Mollett's age, education, work experience and RFC, the ALJ relied upon the testimony of a vocational expert and concluded that Mollett was not disabled and not entitled to DIB or SSI because he retained the capacity to perform a significant number of jobs despite his functional limitations. (Tr. 26). Thus, Mollett's claim failed at step five of the evaluation process. (Tr. 27). Mollett believes

that the ALJ committed several errors requiring reversal.

Hypothetical Question Posed to Vocational Expert

The ALJ found that Mollett had moderate difficulties in concentration, persistence, or pace. (Tr. 17). Despite this finding, the ALJ's RFC does not reference this limitation, referring instead to the nonexertional limitation of simple, repetitive work tasks. (Tr. 18). Mollett contends the ALJ erred by posing a hypothetical question to the vocational expert ("VE") without including all limitations supported by the medical evidence of record, including deficiencies of concentration, persistence and pace. (Tr. 18). The Commissioner believes that the ALJ's finding that Plaintiff was limited to simple repetitive work adequately accounted for his determination that Plaintiff had moderate deficiencies in concentration, persistence, or pace. (DE 19 at 6-7).

At the hearing, the following exchange occurred between the ALJ and VE:

> Q: All right, let me ask you a hypothetical question. Please disregard any information you may have gathered from reading the file or listening to the testimony, I'll just give you a hypothetical. This hypothetically [sic] individual in the age range of 39-41 educated at a 12th grade level. He has [INAUDIBLE}, same as Claimant. Limited to only the simpler repetitive tasks that avoid even moderate exposure to the hazards and avoid concentrate exposure to the pulmonary irritants. That would eliminate past work, is that right?
> A: That is correct – sorry the back work is semi-skilled.

Q: All right, are there any available jobs for such an individual?
A: Yes, Your Honor.
\* \* \*
ALJ: Okay, now let's assume the Claimant's testimony is fully credible, [INAUDIBLE] supported by the evidence. Do you believe there would be a job such an individual could be able to perform?
VE: Well, Your Honor, due to the ability to be able [to] remain on task and possible absenteeism issues the person would need to be on [sic] task less than 15 percent of a work day. If they were off task more than that they would be terminated. With the absenteeism a person would need to attend -sorry, an employee, if they miss anywhere between one to two days a month with the average being 1.75 days a month would be terminated from competitive employment.

(Tr. 55-57).

In the Seventh Circuit, an ALJ is generally require to orient the VE to the totality of a claimant's limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). "Among the limitations the VE must consider are deficiencies of concentration, persistence and pace." *Id.* (citing *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir.2009); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir.2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)). "[T]he most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *O'Connor-Spinner*, 627 F.3d at 619. But, there is not "a per se requirement that the terminology ("concentration, persistence and pace") be used in the hypothetical in all cases." *Id*.

For example, it can be assumed that a VE is familiar with the

claimant's limitations, despite any gaps in the hypothetical posed by the ALJ, "when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing these limitations." *Id*. However, this exception is inapplicable where the ALJ poses a series of increasingly restrictive hypotheticals to the VE, because it can then be inferred that the VE's attention is focused on the hypotheticals rather than the record. *Id*. ALJ Pope explicitly asked the VE who testified at Mollett's hearing to disregard any information he may have gathered from reading the file or listening to the testimony and then asked his first hypotheticals. (Tr. 55-57). When the VE was later asked to accept the claimant's testimony as fully credible, the VE determined that the reported limitations would likely prohibit competitive employment. (Tr. 55-57). Accordingly, this exception is inapplicable.

Additionally, where the ALJ's hypothetical omits the terms "concentration, persistence and pace," the Court has declined to find error when "the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner*, 627 F.3d at 619. This exception is most frequently utilized where the claimant's limitations were stress or panic related in a hypothetical restricting the claimant to low-stress work. *Id*. This is not a case about stress, and the limitation to simple, repetitive work does not appear to adequately take into account the limitations imposed by Mollett's moderate limitations with regards to

-17-

concentration, persistence and pace stemming from his cognitive disorder and difficulties with focus and concentration.  The facts of this case do not fit within this particular exception to the general rule that an ALJ must orient the VE to the totality of a claimant's limitations.

The Seventh Circuit, in *O'Connor-Spinner*, discussed the case of *Simila v. Astrue* as an example of a case that falls outside of the general rule, but "just barely so." *O'Connor-Spinner*, 627 F.3d at 619-21 (7th Cir. 2010)(citing *Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009)).  In *Simila*, the claimant's difficulties with concentration, persistence and pace stemmed from a chronic pain syndrome and somatoform disorder, and, although the limitations of concentration, persistence and pace were not mentioned in the hypothetical, the underlying conditions were mentioned.  The Seventh Circuit stated in *O-Connor-Spinner* that "[o]n the facts of that case [*Simila*], the link between the claimant's pain and his concentration difficulties was apparent enough that incorporating those difficulties by reference to his pain was consistent with the general rule, albeit just barely so." *O-Connor-Spinner*, 627 F.3d at 620.  After describing the ALJ's failure to include limitations of concentration, persistence and pace in the hypothetical as "troubling," the Court noted the following:

> In most cases ... employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace. The ability to stick with a given task over a sustained period is

> not the same as the ability to learn how to do tasks of a given complexity. . . .
>
> . . . . As discussed, limiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence and pace.
>
> We acknowledge that there may be instances where a lapse on the part of the ALJ in framing the hypothetical will not result in a remand. Yet, for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do.

*Id.* at 620-21 (citations omitted). Mollett's underlying condition was not referenced in the ALJ's hypothetical. Accordingly, the exception noted in *Simila* is inapplicable.

A little over a month prior to the Seventh Circuit's decision in *O'Connor-Spinner*, the Seventh Circuit addressed a similar issue in an unpublished[1] case, *Milliken v. Astrue*, 397 F. App'x 218, (7th Cir. 2010). The Commission relies upon *Milliken* to support its statement that, in the Seventh Circuit, "a limitation to unskilled or simple work can adequately account for moderate deficiencies in concentration, persistence, or pace." (DE 19 at 7). In *Milliken*, the hypothetical posed to the VE was based on the testimony of a medical expert who essentially translated his medical opinion into a RFC assessment. The Court held that a hypothetical limited to unskilled work adequately took into account the medical expert's assessment of the claimant's mental limitations, including

_____

[1]According to Circuit Rule 32.1, unpublished opinions such as *Milliken* are not to be treated as precedents.

limitations in concentration, persistence and pace. The Commissioner has made no effort to explain how *Milliken*, which falls outside the general rule, is applicable to the instant case. No medical expert testified at Mollett's hearing. The ALJ's hypothetical did not ask the VE to accept the limitations of any particular physician; rather, he crafted his own RFC based on his opinion of the record as a whole. Thus, to the extent that the unpublished opinion of *Milliken* can be viewed as creating another exception to the general rule, it is one that is not applicable here.

The Seventh Circuit has clearly stated that, "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O-Connor-Spinner*, 627 F.3d at 620-21. That did not occur here, and none of the exceptions to the general rule appear to apply. On the record before this Court, there is no assurance that the VE's testimony adequately took into account the claimant's limitations of concentration, persistence and pace. In fact, the VE's response to the ALJ's second hypothetical (the hypothetical asking the VE to assume the claimant's testimony was fully credible) suggests that limits in concentration, persistence and pace may indeed have resulted in the VE concluding that no jobs existed for the hypothetical individual. The ALJ should have referred expressly to limitations on concentration, persistence and

pace in the hypothetical, and the error requires reversal.

Because the ALJ's error regarding the hypothetical questions requires remand, the Court need not consider the claimant's arguments regarding the treatment of one of Dr. Banas' statement or the ALJ's credibility determination.  However, it is worth noting that reading the ALJ's repeated statements that Mollett's allegations were "not credible to the extent they are inconsistent with" the ALJ's assessment of the RFC brought to mind the recent decision of the Seventh Circuit in *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), in which it was noted that such language "backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility."  (See Tr. at 19-20, 24, 25).  This argument was not made by the parties, and this Court does not intend to develop it for them, but since the case is being remanded, the Commission is directed to keep the Seventh Circuit's recent opinion of *Shauger* and others like it in mind upon remand.


CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

DATED: September 7, 2012                    /s/ Rudy Lozano, Judge
                                            United States District Court